NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

IN RE TERMINATION OF PARENTAL RIGHTS AS TO S.F.

No. 1 CA-JV 24-0005
FILED 06-06-2024

---

Appeal from the Superior Court in Maricopa County
No. JD37215
The Honorable Michael Z. Rassas, Judge
The Honorable Michael D. Gordon, Judge

**AFFIRMED**

---

COUNSEL

Maricopa County Legal Defender, Phoenix
By Jamie R. Heller
*Counsel for Appellant*

Arizona Attorney General's Office, Phoenix
By Ingeet P. Pandya
*Counsel for Appellee*

---

## MEMORANDUM DECISION

Presiding Judge Paul J. McMurdie delivered the Court's decision, in which Judge Maria Elena Cruz and Judge Cynthia J. Bailey joined.

---

**M c M U R D I E**, Judge:

**¶1**        Loretta F. ("Mother") appeals from an order terminating her parental rights as to her son. She contests the severance on the abandonment and 15-month grounds, and she also argues the juvenile court erred as a matter of law in its best interests inquiry. We find no error and affirm.

### FACTS AND PROCEDURAL BACKGROUND

**¶2**        Mother is the parent of Seth,[1] born in 2016. Seth's alleged father's rights were terminated on the abandonment ground, and he is not a party to this appeal.

**¶3**        Seth is a "medically fragile" child. He has Pierre Robin syndrome, congenital hydrocephalus, congenital muscular hypotonia, and experiences seizures. He requires a wheelchair, a ventilator to maintain his airway, and a G-tube for feeding. Seth also needs ongoing medical check-ups with several medical specialists.

**¶4**        In March 2019, Mother was driving from Texas to California with Seth in the car when Seth removed his tracheostomy tube. After Mother struggled to replace the tube, she took Seth to Phoenix Children's Hospital. Seth was admitted to the hospital with fever, vomiting, and other symptoms of infection. Seth presented with a virus "similar to RSV" and multiple infections in his trach area. Mother reported that Seth's last doctor visit was eight months ago in Texas. While Seth was in the hospital, Mother visited "a small number of times," "stayed for short periods of time," and did not call to check up on him. She did not pick Seth up when he was discharged.

**¶5**        Concerned about medical neglect, the hospital contacted the Department of Child Safety ("Department") and placed Seth with the

---

[1]        We use a pseudonym to protect the child's identity.

Department. The Department discovered that Seth was the subject of an open Child Protective Services case in Texas, and it became concerned that Mother often moved from state to state "to evade CPS," only obtaining medical care for Seth in emergencies. The Department placed Seth in a medical group home and filed a dependency petition alleging neglect "by failing to provide for his basic needs, including appropriate medical care." *See* A.R.S. § 8-841. In May 2019, the juvenile court granted the dependency petition after Mother failed to appear at the hearing.

¶6        The Department tried to coordinate services for Mother. But in the months following the dependency, Mother moved multiple times between Tucson, Las Vegas, and Phoenix and did not provide addresses to the Department. Mother requested to visit Seth, but within the first two months, she missed six of the eight scheduled visits. Based on the inconsistent visits, the Department closed out the supervised visitation service, and Mother did not visit Seth for about ten months. Mother resumed visitation virtually in April 2020. But by July 2020, Mother had missed one-third of the scheduled visits and had not begun training on caring for Seth's medical needs or seen him in person for over a year.

¶7        In August 2020, the Department moved to terminate Mother's parental rights on the 15-month ground. *See* A.R.S. § 8-533(B)(8)(c). The Department alleged that Mother had not participated in the reunification services offered and lived in another state, presumably Nevada. While the motion was still pending, the Department reported that Mother was not participating in Seth's weekly phone services and identified at least 24 dates in 2020 when Mother missed scheduled virtual visits with Seth. Still, the Department acknowledged that Mother "engage[d] with [Seth] and talk[ed] to him" at visits and she "appear[ed] to care for her son."

¶8        The juvenile court denied the termination motion. It found that while Seth had been in out-of-home care for over 15 months, the Department failed to provide reasonable reunification services. *See* A.R.S. § 8-533(B)(8)(c). The court shared the Department's concern that "Mother could not adequately explain her absence from [Seth's] life between June 2019 and April 2020," which "represents profound neglect." But it also acknowledged that Mother "is apparently teachable" because the hospital at Seth's birth trained her, and she "demonstrated a significant understanding of [Seth's] fragile condition and his needs." Still, because Mother's return to engagement with her services in March 2020 coincided with the onset of the COVID-19 pandemic, most of her services had only been virtual. The court recognized that this was a problem because the need for specialized medical training was "the <u>core</u> issue," and virtual visits

offered no utility for training. The court determined that "COVID or not, the Department must provide Mother with a reliable way to be trained to meet [Seth's] needs or otherwise demonstrate that she can already do that. The failure to do so requires denial of the Severance Motion."

¶9 The court also found that the Department failed to prove severance was in Seth's best interests. It reasoned that "[w]hile [Seth's] young age and sweet disposition arguably makes him adoptable, he has extremely high needs." The court noted that the Department offered no specific information about proposed out-of-state placement and no predictive measures on whether the requested interstate adoption would be approved. It characterized the prospective adoption as "in the very early stages." And the court acknowledged that the evidence "demonstrated Mother's bond with [Seth]" and that "[Seth] was happily engaged with his Mother" at a recorded in-person visit.

¶10 Following the ruling, Mother's progress was inconsistent. In June 2021, the Department reported that with the easing of COVID-19 restrictions, the home was willing to work with Mother and train her to care for Seth. Still, the Department reported that Mother's "attendance [was] not consistent," and she only attended about one-third of her scheduled visits. The Department recognized "[i]t is evident that [Mother] cares and loves her child" through her gifts and displays of affection. Still, it also expressed concern that Mother would remove her face mask despite the home's rules and Seth's vulnerable condition. In October 2021, the Department reported that Mother's efforts to care for Seth were "a work in progress."

¶11 In January 2022, Mother requested physical custody of Seth. *See* Ariz. R.P. Juv. Ct. 342. She argued that she had received the training necessary to care for Seth and that returning Seth to her care would not cause a substantial risk of harm. In March 2022, the juvenile court granted the motion "effective upon the confirmation that mother has obtained the appropriate bed for the child and has obtained the van to transport the child safely." Two months later, the Department reported that it had still been unable to verify the conditions. The Department also reported that Mother had only visited "a few times" after the ruling and that "[s]he still needs a lot of help" from the group home staff to manage Seth's medical needs.

¶12 By August 2022, the Department verified that Mother had a bed and van for Seth and returned him to Mother's custody. But Mother had not yet completed the training assigned to her by the Department, and the group home remained interested in supervising her to ensure she properly administered Seth's medications. Still, Mother left the state the

next day, taking Seth to Disneyland. In September, the Department learned that Seth had not attended school since returning to Mother's care, and "the school was going to disenroll [Seth] and remove the nurse service." Mother had refused to give her location to the Department. She also had scheduled no appointments for Seth's care.

¶13 As a result, at a report and review hearing, the juvenile court granted the Department's oral motion to retake physical custody of Seth. Seth was returned to the group home, where he was discovered to have lost six pounds while in Mother's care because he had not been given the correct formula. Mother communicated with Seth virtually over the next six months but only visited him in person once.

¶14 The Department filed its second severance motion in July 2023, alleging abandonment and 15-month grounds. *See* A.R.S. § 8-533(B)(1), (B)(8)(c).[2] The juvenile court scheduled the severance trial for December 6. On December 4, the Department moved for a continuance to "review updated disclosure." On December 6, 2023, the court granted the motion, "converting the trial date to a virtual status conference for the selection of a new trial date." The conference was held that afternoon, but Mother did not appear. The court found that Mother had failed to appear without good cause, admitted the allegations of the severance motion, and allowed the Department to proceed in her absence. The Department presented 36 exhibits and Seth's caseworker's testimony.

¶15 At the close of the hearing, the juvenile court granted the severance motion, finding that the Department had proven the abandonment and 15-month grounds by clear and convincing evidence. The court reasoned:

> During the four years this case has been open, [Mother's] contact with her son and DCS continues to be sporadic and inconsistent at best. [Mother] will disappear for months at a time, will randomly reappear for court hearings or contact DCS shortly prior to a hearing, and states she intends to reunite with her son, and then fail to maintain contact.

The court also determined that termination was in Seth's best interests. It explained that termination would provide permanency, stability, and

---

2    The Department's motion also alleged the substance abuse ground, *see* A.R.S. § 8-533(B)(3), but it later withdrew the allegation.

"would further the plan of adoption." Although there was no adoption placement, the court found that Seth was "adoptable" and "[the Department] is making efforts to locate an adoptive placement." Finally, the court found that continuing the parent-child relationship would harm Seth because Mother had shown she was "unable to engage in consistent and routine visits for any sustained period of time," which "add[ed] to instability." The court explained:

> She refused to provide an address to DCS and the court. Additionally, she briefly absconded with [Seth] last September 2022. Mother reported to the court she no longer had various medical equipment necessary for proper care of [Seth]. This lack of respect for court orders, failure to recognize [Seth's] medical needs, and evasive behavior pose substantial risks to [Seth's] health and wellbeing.

¶16        Mother appealed. This court has jurisdiction under A.R.S. §§ 8-235(A), 12-120.21(A)(1), and 12-2101(A)(1).

## DISCUSSION

¶17        Mother challenges the order terminating her parental rights. She claims that the juvenile court erred as a matter of law by terminating her rights on the abandonment and 15-month grounds and finding that termination was in Seth's best interests.

¶18        We will affirm a termination order unless the juvenile court abused its discretion or its factual findings were clearly erroneous. *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47, ¶ 8 (App. 2004). "The juvenile court, as the trier of fact in a termination proceeding, is in the best position to weigh the evidence, observe the parties, [and] judge the credibility of witnesses." *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 4 (App. 2002). We accept the juvenile court's factual findings unless no reasonable evidence supports them. *Id.* We do not reweigh the evidence. *Mary Lou C.*, 207 Ariz. at 47, ¶ 8.

## A.    Evidence Supports the Juvenile Court's Termination on the 15-Month Ground.

¶19        The juvenile court may terminate parental rights if, despite the Department's diligent reunification efforts, a parent has been unable to remedy the circumstances causing a child to be in an out-of-home placement for 15 months or longer and there is a substantial likelihood that the parent will be unable to exercise proper parental care and control in the

near future. A.R.S. § 8-533(B)(8)(c). Here, the juvenile court made these findings. But Mother challenges the Department's reunification efforts and argues that "the record did not demonstrate [Mother] would be unable to parent [Seth] in the near future."

¶20 Mother argues that the Department did not reasonably provide her services when she was living in California between September 2022 and the severance hearing because the Department only offered services in Arizona. She points out that the juvenile court had ordered the Department to provide visitation and concludes that "[i]t was neither diligent nor reasonable for DCS to offer [Mother] services only in Arizona when it was aware she was not living in Arizona."

¶21 But Mother's argument fails. First, Mother routinely refused to provide the Department with her location or address. Even if the Department knew or believed she were living in California, it could not reasonably offer in-person services to her if it did not know her location. And the juvenile court's order denying the severance motion was concerned with Mother's ability to attend *in-person* visits because her ability to manage Seth's medical needs was "the core issue." It is unclear how Mother believes she could have received this training through virtual visits from California.

¶22 Second, Mother does not argue that the Department was not diligent in offering services throughout the rest of the dependency when the Department knew her address. The dependency spanned four years. The juvenile court denied the first severance motion in January 2021, and the Department reported that it was offering Mother visits and training with the easing of COVID-19 in June 2021. Thus, even assuming the Department's reunification efforts became inadequate in September 2022, Mother had received more than 15 months of reunification services. It was within the juvenile court's discretion to determine that the Department's efforts were diligent and to consider Mother's non-cooperation as the cause of any lack of services.

¶23 Mother also failed to request services or object to the juvenile court's reasonable efforts findings at either the December 2022 or April 2023 review hearings. Mother does not explain why she failed to object or how the argument that the Department's services were inadequate is not waived. *See Shawanee S. v. Ariz. Dep't of Econ. Sec.*, 234 Ariz. 174, 179, ¶ 18 (App. 2014) (A parent who fails to object to a service offered by DCS waives the right "to argue for the first time on appeal that [DCS] failed to offer appropriate reunification services.").

¶24 Next, Mother challenges the termination ground because "the record did not demonstrate [Mother] would be unable to parent [Seth] in the near future." She points to evidence of progress in her ability to care for Seth's basic and specialized medical needs and argues that she "had successfully demonstrated her ability to meet [Seth's] needs by having [Seth] returned to her care." But we do not reweigh the evidence; we only look to determine whether the evidence supports the juvenile court's ruling. *See Mary Lou C.*, 207 Ariz. at 47, ¶ 8.

¶25 In the first termination proceeding, the juvenile court emphasized that the "single most important barrier to reunification" had been Mother's "inability to meet [Seth's] high needs as a fragile child." And, in the later reports, Mother never demonstrated that she could independently manage all of Seth's medical needs. In October 2021, the Department reported her efforts as a "work in progress," and she could only perform some of Seth's daily medical needs during her visits. In January 2022, the group home had not seen Mother properly or consistently change Seth's trach tube, administer his medication, or bathe him. By May 2022, Mother did not "fully know" what she was doing and still needed "a lot" of help but would not meet with staff to complete the offered training. When Seth was returned to Mother's care, he lost six pounds on the incorrect formula in less than a month.

¶26 Thus, reasonable evidence supports the juvenile court's conclusion that Mother is unlikely to exercise proper and effective parental care and control of Seth in the near future. Because sufficient evidence supports termination on the 15-month ground, we need not address challenges to the remaining grounds. *See Jesus M.*, 203 Ariz. at 280, ¶ 3.

**B.    The Juvenile Court Did Not Abuse Its Discretion by Finding that Termination Was in Seth's Best Interests.**

¶27 Before terminating parental rights, A.R.S. § 8-533(B) requires the juvenile court to consider the child's best interests. "[T]ermination is in the child's best interests if either: (1) the child will benefit from severance; or (2) the child will be harmed if severance is denied." *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 150, ¶ 13 (2018).

¶28 Here, the juvenile court made multiple best-interests findings. The court found that terminating the parental relationship "would further the plan of adoption, which would provide the child with permanency and stability." The court also found Seth was "adoptable" and that the Department was "making efforts to locate an adoptive placement." The

court also stated that Seth's current placement "provide[d] excellent care" and was meeting his "medical, emotional, physical and educational needs." Finally, the court identified a detriment to continuing the parent-child relationship, finding that Mother's "unpredictability" and "unexplained lack of contact" posed a "substantial" risk to Seth's health.

**¶29**     Mother argues that no reasonable evidence supported the finding that Seth was adoptable or that continuing the parent-child relationship was harmful. She points to the first severance trial when the court found that her recorded visit with Seth "demonstrated Mother's bond with [Seth], a bond which the Case Manager acknowledged that she had never questioned. . . . it was clear to the Court that [Seth] was happily engaged with his Mother." She also distinguishes between a nominally "adoptable" child and one that has a prospective adoptive placement, arguing "[the Department] must prove an adoption is likely not merely speculative." *See Titus S. v. Dep't of Child Safety*, 244 Ariz. 365, 370, ¶ 22 (App. 2018).

**¶30**     But Mother does not contest the juvenile court's finding that Seth's placement "provide[d] excellent care" and was meeting his "medical, emotional, physical and educational needs." This finding supports a best-interests determination. *See Aleise H. v. Dep't of Child Safety*, 245 Ariz. 569, 572, ¶ 10 (App. 2018).

## CONCLUSION

**¶31**     We affirm.

